### James Black and another v. Eber B. Ward.

*Promissory notes: Payable in Canada, "in Canada currency."* A note made and endorsed in Michigan and payable in Canada, "*in Canada currency*," is payable in *money*, and is therefore negotiable; such a phrase in a note made here means no more than that it is payable in Canada money at the Canadian standard, as it would have been without such phrase if made and payable there.

The use of a superfluous phrase of this kind is too common to indicate or permit any inference that it is to change the natural meaning of the instrument; and this is especially so when such forced construction impairs the validity of a contract.

*Ignorance of the law.* Every one is usually bound as if he had a knowledge of the law, whether he has it or not; but there is no rule which conclusively presumes such knowledge as a fact, where that fact is important. Cases referred to expounding the maxim, *Ignorantia legis non excusat.*

*Heard April 23 and 24. Decided April 29.*

Error to Wayne Circuit.

*John H. Bissell* and *Douglass & Miller*, for plaintiffs in error.

*T. C. Owen* and *Pond & Brown*, for defendant in error.

CAMPBELL, J.

Ward was sued as endorser of a note made and endorsed in Michigan, but payable in Canada, expressly in " Canada currency." The circuit court held it was, upon its face, payable otherwise than in money, and not negotiable. This is the only important question before us.

There was some testimony given in the court below upon the meaning of the phrase in question, and the argument in this court has covered a very wide range, it being claimed on the one hand, that the note is payable only in paper, and on the other, that the word currency is used only to indicate that it is payable in Canadian, instead of in American money, without any reference to paper or coin specifically. It is also insisted that if payable in paper current at the value of cash, it would still be negotiable.

The endorser's contract being governed by the laws of this state, and the note having been made here, its negotiability must in our courts be tested by our own statute; but as that is like the statute of Anne, in requiring the paper to be payable in *money,* the only inquiry in this regard is, what may be included in that term.

It will be found by examining the authorities, that the word "money" has been used for some purposes in a very wide sense, and for others in a restricted sense. When questions have come up in construing negotiable paper, it has never been extended beyond coin and paper at par value.

In England, in the case of *Miller v. Race, 1 Burr., 452,* which involved the rights of holders of stolen bank of England bills, the language of Lord Mansfield and of the other judges was so pointed in treating such notes as cash, that, if the question now discussed had been mooted, there can be little doubt how it would have been decided. A series of decisions made afterwards sustained tenders in such bills, where no objection had been made to the medium in which the tender was made.—*Polyglass v. Oliver, 2 C. & J., 15, 16; Brown v. Saul, 4 Esp., 267; Wright v. Reed, 3 T. R., 554.* And these decisions have been followed universally in this country.

The first time when the negotiability of a bill payable in bank of England notes came up for decision was in the interval between 1797 and 1818, during which the bank was restrained from making specie payments. The stat-

utes containing this restriction provided expressly that if the amount of any debt were tendered in notes, the debtor should not be arrested on the debt.—*Tomlyn Law Dic.,* " *Bank of England.*" It was held in *Grigby v. Oakes, 2 B. & P., 526,* that under this statute notes were not a legal tender. Reference was made by some of the court to the peculiar terms of the statute, as limiting the effect of the tender to an exemption from arrest. In *Ex parte Davison, Buck, 31, and Ex parte Imeson, 2 Rose, 225,* it was held that notes payable in " cash or bank of England notes," were not negotiable. In 1834 the notes were made a legal tender; but by the present law they are not such in Scotland or Ireland.—*Fisher's Dig.,* " *Bank of England,*" " *Tender.*" No case has since been reported in which any such question was raised; and whether the silence of the courts arises from the change of the law, whereby the notes are made equivalent to coin, or from any custom excluding any mention of notes in drawing up negotiable paper, we have no means of judging. Where the notes are always convertible and at par with gold, and are a legal tender, there does not seem to be any very good reason for holding a bill payable in notes to be any more objectionable than one payable in coin. In this country all paper not payable expressly in gold is impliedly payable in greenbacks; and we cannot conceive that it can change the legal character of any security to express in it precisely what the law implies.

Where a promissory note is payable in any thing which is not a legal tender, the authorities are generally, though not universally, against its negotiability. In New York and Ohio, bank-bills issued under state authority, and where the courts hold they are bound to recognize their quality judicially, have been held at par to represent money, so that notes payable in cash or in such notes, have been adjudged negotiable.—*Keith v. Jones, 9 J. R., 120 ; Judah v. Harris, 19 J. R., 144; Swetland v. Creigh, 15 Oh., 118.* But in the same states, paper payable expressly in any

other bills, or even in the bills of specified banks of the state, has been held not negotiable.—*Leiber v. Goodrich,* 5 *Cow.,* 186; *Shamokin Bank v. Street,* 16 *Oh. St.,* 1; *Thompson v. Sloan,* 23 *Wend.,* 71; *Little v. Phenix Bank,* 2 *Hill,* 425; 7 *Hill,* 359. Elsewhere, except where there are statutes to the contrary, there is no considerable support for the doctrine that paper payable expressly in the bank-notes of private corporations is negotiable.

Under the laws of this state, bank-bills may be levied on, and may be paid over as cash, if the creditor is willing to receive them; but if he refuses, they must be sold "as other chattels."—*Comp. L.,* §§ 6096, 6456.

If the term "Canada currency" should be confined to private bank-notes, it would be difficult to hold this paper negotiable. In *Thompson v. Sloan,* the supreme court of New York held that a note payable in Buffalo in "Canada money" was not negotiable. This, however, is not, as we think, in accordance with the general current of decision. Judge Story says, "If it be payable in money, it is of no consequence in the currency or money of what country it is payable. It may be payable in the currency or money of England, France, Spain, Holland, Italy, America, or any country."—*Story on Bills,* § 43; *Chitty on Bills,* 153, 158. We cannot with any propriety refuse to recognize the right of every country to fix its currency, and it is impossible for any civilized government to exist without some legal standard of money. The only question here is whether a note payable in "Canada currency" is or is not payable in money.

It is claimed on the one side, and denied on the other, that the term "currency" is confined in our usage to paper which is not money. Upon this question many authorities have been cited, and we have examined each of them, with such other references as we have been able to discover, and we are led to the conclusion that there is no foundation for any such doctrine.

The only cases in which it has been held that "currency"

does not mean money (except where it has been qualified by some further definition), are certain cases in Iowa and Wisconsin, all of which rest entirely upon the authority of decisions where the paper in question was expressly payable in bank-notes. None of these decisions supports the idea that "currency" and "bank-notes" are purely convertible terms, and the inference is unwarranted, unless founded on what does not appear in any of those decisions. The decision in *Wright v. Hart's Admr., 44 Penn. St. R., 454,* that paper payable "*in current funds at Pittsburgh*" was not negotiable, was also rested, without any further discussion, upon the authority of former decisions applicable to paper payable in bank-notes.

In *Dillard v. Evans, 4 Ark., 175,* the term "*common currency of Arkansas*" (in which certain paper was made payable), was held designed to point out a different currency from that which was legal, and to refer to depreciated paper, which was then, in fact, the common medium of business. And in *Farwell v. Kennett, 7 Missouri, 595,* it was held that the insertion of the words "payable in currency" indicated a design to change the legal import which would have been found had no such words been inserted. And in *Conwell v. Pumphrey, 9 Indiana, 135,* the use of the term "current funds" was held for the same reason an intentional variation. Subsequent decisions in each of those states have either overruled these cases, or so interpreted them as not to make them apply to a case like the one before this court. Reference will be made presently to these later decisions.

With these exceptions, the general course of authority is in favor of the negotiability of paper payable in currency or in current funds. And these decisions rest upon the ground that those terms mean "money," as the necessity of having negotiable paper payable in money is fully recognized.

There is, however, some difference in the methods of arriving at this result, and it is proper to refer to the cases which have used careless language, as well as to those

which have laid down rules cautiously.    The fact that the
bills of sound banks have been received promiscuously with
the legal money of the country has led here, as in England,
to remarks from courts based on the assumption,—which is
well founded,—that persons usually do not prefer one to the
other, and they sometimes speak of payment in either as
amounting to the same thing.    It is only where the ques-
tion is directly presented of a tender actually made in one
or the other, that discrimination becomes necessary.    Thus
in *Lacy v. Holbrook, 4 Ala., 88*, where a bill of exchange
payable in "funds current in the city of New York" was
held negotiable, it was so held because deemed to be paya-
ble in cash, in gold or silver coin "*or its equivalent.*"    So
in *Bank of Peru v. Farnsworth, 18 Ill., 563; Laughlin v.
Marshall, 19 Ill., 390; Swift v. Whitney, 20 Ill., 144;* and
*Hunt v. Divine, 37 Ill., 137*, promissory notes or certificates
of deposit payable in "currency" were held to be negotia-
ble on the same ground; but there is reference made to the
equivalence of bank-notes with other money, which are open
to the same hyper-criticism that the court confounded real
with conventional money.    It is to be observed, however,
that none of these cases called for any decision as to what
would be a legal tender in payment of such notes.

The decisions of other states are less open to remark.
In Arkansas, where the rule is strict in denying the nego-
tiability of paper not payable in money (see *Hawkins v.
Watkins, 5 Ark., 481, and Dillard v. Evans, 4 Ark., 175*),
it was held in *Graham v. Adams, 5 Ark., 261*, that a note
payable in "good current money of the state" was negotia-
ble.    The court, after some discussion, remark:  "A good
currency, then, in our opinion, means nothing more than a
lawful currency, and that is, current coin of the United
States."    In *Wilburn v. Greer, 6 Ark., 255*, it was held a
note payable in "Arkansas money" was payable in "current
coin of the United States," and therefore negotiable.    In
*Burton v. Brooks, 25 Ark., 215*, it was held a note payable
in "greenback currency" was payable in the currency of

the United States, and not in national or other bank-notes, and that the meaning was the same as if it had been made payable in dollars only.

In Indiana, in *Drake v. Markle, 21 Ind., 433*, it was held the term "currency" meant money, and that a note payable therein was negotiable. This case practically overrules *Conwell v. Pumphrey*, which, as we have seen, was decided on the assumption that parties never use unnecessary words in making negotiable paper.

In Mississippi, in *Mitchell v. Hewitt, 5 Smedes & Marshall, 361*, the note was payable in "currency of the state of Mississippi." The court say that this phrase "can only mean that which has been declared to be a legal tender, because currency implies lawful money." Reference was made to an early Pennsylvania case, *Wharton v. Morris, 1 Dal., 133*, where upon a somewhat similar state of facts it became necessary to define the words of a note. The court there held that "lawful" and "current" were synonymous words, and said the "lawful current money of Pennsylvania," that which was declared to be a lawful tender, and consequently became the legal currency of the land, was the money emitted under the authority of congress. In *Lee v. Biddis, 1 Dal., 188*, it was further held (as must necessarily be the case if courts are to construe such language), that evidence could not be received to give any other explanation.

In Minnesota, in *Butler v. Paine, 8 Min., 324*, currency was held to be lawful money, and the following definition from *Bouvier's Law Dictionary* was approved: "The money which passes at a fixed value from hand to hand; money which is authorized by law."

In Missouri, where, in an earlier case (*Farwell v. Kennett, 7 Mo., 595*), it had been held as it had been in Indiana, that words of surplusage must have a controlling and repugnant meaning, and that a note payable "in currency" was not payable in money, it was distinctly held in *Cockrill v. Kirkpatrick, 9 Mo., 688*, that paper payable in "*currency*

*of Missouri*" was payable in lawful money of the United States, and that Missouri currency could mean nothing else.

In Tennessee, it was held in *Searcy v. Vance, 1 Mar. & Yerg., 225,* that paper payable in "Tennessee money" was only payable in gold and silver, and that those words would not include bank-notes. The same state holds paper payable in current bank-notes of Tennessee, or in such notes generally, not to be negotiable.—*Kirkpatrick v. McCullough, 3 Humph., 171; Whiteman v. Childress, 6 Humph., 303; Simpson v. Moulden, 3 Coldw., 429; McDowell v. Keller, 4 Coldw., 258.*

In Louisiana, it was held in *Fry v. Dudley, 20 La. An., 368,* that a bill of exchange payable "in currency" is payable in legal current money, and a person who receives such a bill for collection is not authorized to receive payment in any thing else.

In *Ehle v. The Chittenango Bank, 24 N. Y., 548,* a dividend "payable in New York state currency" was held payable in cash. And it was held incompetent to inquire of a cashier what he understood that phrase to mean. The court say: "The term 'New York state currency' must be held to mean what the ordinary signification of those words implies, unless *by some general known usage* some other technical meaning can be attached to it."

We have been referred to the case of *Gray v. Worden, 29 Q. B. Reports (Upper Canada), 535,* as bearing adversely on this point. That case decides that a note payable "*in Canada bills*" is not negotiable, even though construed to mean government legal tender notes. It is based upon the decisions made in England and America relative to paper payable in bank-notes, and holds the official notes as mere promises to pay money, and not as money. That doctrine would not be admissible under our legal tender laws. But the case is chiefly relied on for some remarks it contains distinguishing the word "currency" from "money."

It seems to have been supposed by counsel that this distinction was the same as that between bills and money,

or in other words, that currency and bills are synonymous. This is an evident misapprehension. The language used is this: "There is a difference between money and currency. In *Lansdowne v. Lansdowne, 2 Bligh, O. L., 78,* Lord Redesdale said in 1820: 'There is no lawful money of Ireland. It is merely conventional. There is neither gold nor silver coin of legal currency; nothing but. copper. There is no such thing as Irish money; it is Irish currency.' —See also *Kearney v. King, 2 B. & Ald., 301; Sprowle v. Legge, 1 B. & C., 16."*

The distinction which the Canadian court points out is not one between paper and coin, but between the values of money in different countries. In the cases referred to it appears that the difference between the Irish pound sterling and the English pound sterling was such that twelve English pounds were equivalent to thirteen Irish pounds. In like manner a Canadian pound represents only four-fifths of an English pound, and the old New York pound was but two dollars and a half,—the York shilling being twelve and a half cents, the Canadian shilling twenty cents, and the British shilling nominally taken at about twenty-five cents. The pound in Jamaica is *five*-sevenths of the English pound. —*Scott v. Bevan, 2 B. & Ad., 78.* Judge Story has collected some learning on this subject in *Confl. of Laws,* §§ *308 to 313.* See also *Taylor v. Booth, 1 C. & P., 286; Cope v. Cope, 15 Sim. 118.*

In *Macrae v. Goodman, 10 Jur., 555, 5 E. F. Moore, 315 (6 Harr. Dig. 690),* a similar consideration came up in regard to "*Holland currency,*" where that term was used in a contract made in Guiana, the colonial guilder being different from the Dutch guilder.

In *Lansdowne v. Lansdowne* the question was, whether under a marriage settlement a rent charge on lands in Ireland was payable in English currency, that is to say, whether the annuity of three thousand pounds was to be in English pounds sterling or at a less rate. The currencies of Ireland and England have, it is said, been equalized since that decision. But there was not then, as remarked by

Lord Redesdale, any Irish coinage, and the difference was merely one of computation.

Similar differences may at any time arise between the coinage of various countries as they change their standards. The dollar of one country may be, and probably is sometimes, different in intrinsic value from that of another. The "currency" spoken of in the Canadian decision is the measure of value. It is in this sense that Lord Redesdale speaks of currency in Ireland.

A note payable in Canada currency means no more and no less than that it is payable in Canada money at the Canada standard, and that it is governed as to the amount it calls for, by the same rule as if it had been made in Canada, and payable in so many dollars, without containing any further direction.

It is evident the language was used to exclude the idea that it should be paid in dollars according to our paper standard, and to put it on the footing of a gold contract.

It is urged that this is superfluous, and that as every one is presumed to know the law, it would not have been put in except for some purpose which would change its legal import. This objection appears to us to be far fetched and unreasonable. The cases cited above sufficiently answer it. A very large proportion of the bonds and deeds drawn up in this country describe the money secured or paid, as "lawful money of the United States," when there can be no other lawful money in the republic, and when it is clearly superfluous.

But the maxim referred to in regard to a knowledge of the law is misapplied. No man can avoid a liability, as a general thing, because he is ignorant of the law. This is an essential rule of society. But the law is not so senseless as to make absurd presumptions of fact. In *Regina v. Mayor of Tewkesbury, L. R., 3 Q. B., 628,* this supposed maxim was very clearly explained, and it was held that where an actual knowledge was in question, the legal presumption could not supply it. *Blackburn, J.,* uses this language:

"From the knowledge of the fact that Blizard was

mayor and returning officer, was every elector bound to know as matter of law that he was disqualified? I agree that ignorance of the law does not excuse. But I think that in *Martindale v. Falkner, 2 C. B., 719, Maule, J.,* correctly explains the rule of law. He says: 'There is no presumption in this country that every person knows the law; it would be contrary to common sense and reason, if it were so.' In *Jones v. Randall, Cowp., 38, 40, Dunning, arguendo,* says: 'The laws of this country are clear, evident, and certain; all the judges know the laws, and knowing them administer justice with uprightness and integrity.' But Lord Mansfield, in delivering the judgment of the court, says: 'As to the certainty of the law mentioned by Mr. Dunning, it would be very hard upon the profession if the law was so certain that everybody knew it; the misfortune is that it is so uncertain that it costs much money to know what it is even in the last resort.' It was a necessary ground of the decision in that case that a party may be ignorant of the law. The rule is that ignorance of the law shall not excuse a man, or relieve him from the consequences of a crime, or from liability upon a contract. There are many cases where the giving up a doubtful point of law has been held to be a good consideration for a promise to pay money." The learned judge proceeds further to the same effect, and the judgment of the court in that case, as in the one cited from Lord Mansfield, rested upon the sole ground that a person was not presumed as a matter of fact to know the law relied on to disqualify him as a voter.

In the present case we are asked not only to presume conclusively that the maker and endorser of the note in suit knew the law, but also that by inserting expressly what the law would have implied, they must be presumed to have meant something else. This would not be a reasonable presumption. It is a very natural thing for men to make their meaning stronger by excluding possible inferences, and

27 MICH.—26.

by expressing what they wish, and not leaving it to implication.

It is worthy of remark that Judge Story in his Conflict of Laws, originally laid down the doctrine that such a note as this, made here and payable in Canada, would in the absence of any words to the contrary, be payable by the American standard.—*Confl. L.*, §§ *271, 271 a*. But he subsequently added a section making the place of payment control in the absence of any thing to the contrary.— § *272 a*. It is not strange that persons contracting for a payment abroad, where the foreign law is certainly not presumed to be known here, unless by a presumption much further removed, should prefer to make their papers intelligible on their face.

We hold the note in controversy to be a note payable in Canada precisely as if it had been made there without qualification, or in other words, to be payable in the lawful money of Canada.

Where words bear a natural and known legal meaning which will maintain the validity of a contract, it would be mischievous to permit evidence to give a meaning which would destroy it. Negotiable paper is intended to circulate generally, and not in confined localities, and if there should happen to be a meaning in one place which differed from that elsewhere, a purchaser would be defrauded without remedy if he were compelled to go behind the terms of the security. If parties desire to give a confined meaning, it is easy to express it. If they choose to make notes payable in chattels, they should say so. But the language used here is in our opinion too plain to be perverted, and there is no reason to believe the maker of the note meant any thing but what he said.

The judgment must be reversed, with costs, and a new trial granted.

The other Justices concurred.